Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORDAN CIANCI, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILIARLY SITUATED, <br><br><br> Plaintiff, <br><br><br> vs. <br><br> BLUE EARTH, INC., JOHNNY R. THOMAS, JOHN FRANCIS, AND BRETT WOODARD, <br><br> Defendants. | No.  2:14-cv-08263-DSF (JEMx) <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> <u>CLASS ACTION</u> |

Amended Class Action Complaint for Violation of the Federal Securities Laws

1    Lead Plaintiff the Childrey Trust and Joe Childrey, individually, as trustee of the

2   Childrey Trust and on behalf of all other persons similarly situated, by his undersigned

3   attorneys, alleges in this Complaint the following upon knowledge with respect to his

4   own acts, and upon facts obtained through an investigation conducted by his counsel,

5   which included, inter alia: (a) review and analysis of relevant filings made by Blue

6   Earth, Inc. ("Blue Earth" or the "Company") with the United States Securities and

7   Exchange Commission (the "SEC"); (b) review and analysis of Defendants' public

8   documents, conference calls and press releases; (c) review and analysis of securities

9   analysts' reports and advisories concerning the Company; (d) information readily

10   obtainable on the Internet; and (e) an investigated conducted by and through Plaintiff's

11   attorneys.

12    Plaintiff believes that further substantial evidentiary support will exist for the

13   allegations set forth herein after a reasonable opportunity for discovery.  Most of the

14   facts supporting the allegations contained herein are known only to Defendants or are

15   exclusively within their control.

16   **I.    NATURE OF THE ACTION**

17    1.    This is a federal securities class action on behalf of all persons and entities,

18   other than Defendants, who purchased the common stock of Blue Earth during the

19   period from October 7, 2013 through October 21, 2014, inclusive (the "Class Period"),

20   and who held such shares on October 21, 2014, seeking to recover damages caused by

21   Defendants' violations of federal securities laws (the "Class").

22    2.    Blue Earth is a publicly traded corporation that purports to provide

23   renewable and green energy solutions to businesses and municipalities.  It began life

24   as a shoe company called "Cherry Tankers" until the stock promoter John Liviakis

25   became a large shareholder.  Liviakis' associates Johnny Thomas and John Francis

26   joined the company shortly thereafter.  Liviakis, Thomas and Francis have a long

27   history together dating back to 1993.

28    3.    This is not, however, a history of successful business management.

1

Instead, Liviakis, Thomas and Francis wildly exaggerate the value of public companies that Thomas and Francis run, and make large profits from stock sales. Then, they depart those companies, allowing them to collapse in their wake, impoverishing outside shareholders. They are serial offenders who have run this scam with at least three companies before: Fiberchem, Inc., AgriBioTech, Inc, and Consolidation Services, Inc. Now, they are attempting to do the same at Blue Earth.

4.     Already, Blue Earth has made a series of worthless acquisitions, wildly exaggerated their prospects, and then quietly delivered disappointing results. On two separate occasions, they have claimed that acquired companies would produce of dollars in revenues, but these acquired companies have failed to generate more than even $3 million.

5.     Blue Earth has recently purchased two companies, Millennium Power Solutions and IPS Power Engineering. Again, they have made wildly exaggerated claims about the acquired businesses.

6.     With Millennium Power Solutions, Blue Earth got into the business of providing Battery Backup Systems ("BBS"), which are designed to power signalized traffic intersections during loss of utility power. Its UltraPower Stealth Battery Backup System ("UPStealth") can be formed into various configurations to allow it to bend around corners and fit into spaces that cannot be accessed by traditional backup systems. During the Class Period, Blue Earth first claimed that the size of the potential market for the UPStealth system was all signalized traffic intersections in the United States. Then it mysteriously reduced the claim to one quarter of all intersections. Blue Earth also claimed that it would sell the UPStealth system for $5,800 per unit, giving it a total potential market size in excess of $500 million for North America.

7.     IPS Power Engineering brought Blue Earth into the business of constructing and operating Combined Heating and Power ("CHP") alternative energy plants. Blue Earth claimed to have an agreement with JBS, S.A., the world's largest food processing company, to build 3 to 4 CHP plants by the end of 2014.

8.      On October 21, 2014, the short seller Pump Stoppers published an article asserting that Defendants massively overstated the potential market value of UPStealth, revealing to the investing public that Blue Earth exaggerated the total market size for UPStealth.  Pump Stoppers was correct.  As a Utah governmental database reveals, UPStealth costs $4,555 retail, which in a best case scenario leads to a wholesale price to Blue Earth of around $3,000, little more than half of what Defendants claim.  In addition, none of the jurisdictions where Blue Earth sold UPStealth products purchased UPStealth for one quarter of its intersections, let alone all.  Therefore, Blue Earth's market size claim for UPStealth was inflated by more than 100%.

9.      Pump Stoppers also revealed that Blue Earth had not constructed a single power plant for JBS, and that Defendants therefore could not possibly complete three or four plants within one year.  Pump Stoppers was also correct in this statement.  In fact, in December of 2014 Blue Earth only had two plants under construction, and neither was completed by the end of 2014.

10.     On this news, the Company's stock fell $1.29 per share, or 50%, on extraordinary volume from its previous closing price to close at $1.29 per share on October 21, 2014.

## II.    JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

13.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misleading public filings and press releases entered this district.

14.     In connection with the acts, conduct and other wrongs alleged herein, defendants either directly or indirectly used the means and instrumentalities of

3

Amended Class Action Complaint for Violation of the Federal Securities Laws

1    interstate commerce, including but not limited to the United States mails, interstate
2    telephone communications and the facilities of the national securities exchange.

3    **III.   PARTIES**

4        15.    Lead Plaintiff Joe Childrey, on behalf of himself and as trustee for the
5    Childrey Trust, purchased Blue Earth common stock during the Class Period and has
6    suffered damages as set forth in the certification previously filed with this Court
7    (Docket No. 14-2).

8        16.    Blue Earth is a Nevada corporation headquartered in Henderson, Nevada.

9        17.    During the Class Period, Blue Earth's common stock was actively traded
10   on OTC QB until it was listed on NASDAQ on August 29, 2014 under the ticker
11   symbol "BBLU."

12       18.    Defendant Johnny R. Thomas ("Thomas"), has been a director of the
13   Company since February 22, 2011.  He has been employed by the Company as Chief
14   Executive Officer since September 1, 2010, and also served as President from
15   September 1, 2010 until May 16, 2013.  Prior thereto, he served as Chairman of the
16   Board, Chief Executive Officer and President of Consolidation Services, Inc. from that
17   company's inception on January 26, 2007 until April 2, 2010.  From January 2000 until
18   September 2010, Thomas was self- employed as an investor in securities, real estate
19   and limited custom home development.  Prior thereto, he was a founder and served as
20   Chairman of the Board and CEO of AgriBioTech, Inc. from September 1993 until
21   February 1999. AgriBioTech and several of its subsidiaries filed a voluntary petition
22   for bankruptcy in January 2000 (and was subsequently liquidated in Chapter 7),
23   approximately eleven months following Thomas's departure from the Company.  Since
24   January 2010, he has been the President and a director of Colt Resources, Inc., a private
25   Nevada corporation.  Prior thereto, he was President, CEO, and a director of Fiberchem,
26   Inc. from December 1986 until March 31, 1994.

27       19.    Defendant John Francis ("Francis"), has been Vice President of Corporate
28   Development and Investor Relations from September 2010 to the present.   Prior

thereto, he served as Vice President, Chief Financial Officer and a director of Consolidation Services, Inc. from its formation on January 26, 2007, and as Secretary/Treasurer from September 16, 2008 until April 2, 2010. From January 2000 to 2008, Francis was a co-founder and managing member of Falcon Financial Group, LLC. Francis also founded and was an officer and director of FiberChem, Inc. He served as Chief Financial Officer (from April 1994 to April 1996), and vice-president, secretary and director (April 1994 through January 1999) of AgriBioTech, Inc. AgriBioTech and several of its subsidiaries filed a voluntary petition for bankruptcy on January 2000 (and was subsequently liquidated in Chapter 7), approximately eleven months following Francis' departure from the Company. Prior thereto, Francis was CFO and a director of Fiberchem from December 1986 until March 31, 1994.

20.     Defendant Brett Woodard ("Woodard"), has been CFO of Blue Earth from May 16, 2013 to the present. He served as a founder, director and CFO of IPS Engineering, Inc. from 2012 until its acquisition by Blue Earth in May 2013. Prior thereto, from 2007, Mr. Woodard served as the CFO of Wasatch Wind, Inc., an enterprise that developed wind energy projects in the Western US and Eastern Canada.

21.     Thomas, Francis and Woodard are collectively referred to hereinafter as the "Individual Defendants."

22.     Each of the Individual Defendants:

    (a)     directly participated in the management of the Company;

    (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

    (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

    (d)     was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

1     (e)     was aware of or recklessly disregarded the fact that the false and

2    misleading statements were being issued concerning the Company; and

3     (f)     approved or ratified these statements in violation of the federal

4    securities laws.

5    23.    As officers, directors, and controlling persons of a publicly-held company

6 whose common stock is and was registered with the SEC pursuant to the Exchange

7 Act, and was traded on the OTCQB and NASDAQ and governed by the provisions of

8 the federal securities laws, the Individual Defendants each had a duty to disseminate

9 accurate and truthful information promptly with respect to the Company's financial

10 condition and to correct any previously-issued statements that had become materially

11 misleading or untrue to allow the market price of the Company's publicly-traded stock

12 to reflect truthful and accurate information.

13    24.    Blue Earth is liable for the acts of the Individual Defendants and its

14 employees under the doctrine of *respondeat superior* and common law principles of

15 agency as all of the wrongful acts complained of herein were carried out within the

16 scope of their employment with authorization.

17    25.    The scienter of the Individual Defendants and other employees and agents

18 of the Company is similarly imputed to Blue Earth under *respondeat superior* and

19 agency principles.

20 **IV.    BACKGROUND TO, AND MOTIVE FOR, THE FRAUD**

21    **A.    Thomas and Francis' History of Failed Businesses**

22    26.    Defendants Johnny Thomas and John Francis long histories as business

23 executives. Unfortunately, it is a history of mismanagement and financial disaster for

24 investors, but tidy profits through stock sales for Defendants.

25    27.    Thomas and Francis were cofounders of FiberChem, Inc. From the

26 founding of Fiberchem in December 1986 until March 31, 1994, Thomas was

27 President, CEO, and Chairman of Fiberchem. Francis was CFO and a director of

28 Fiberchem during that same period. On October 22, 1993, Fiberchem entered into a

1  consulting agreement with Liviakis Financial Communication, Inc., a stock promotion

2  firm owned by John Liviakis.  Liviakis was paid 1,730,000 shares of Fiberchem stock,

3  plus 4,375 shares per month.

4        28.    Defendants Thomas and Francis, along with two other individuals, left

5  Fiberchem after purchasing from the company a subsidiary called AgriBioTech, Inc.

6  ("AgriBioTech").  Thomas was chairman and CEO of that company from September

7  1993 to February 1999.  John Francis was Vice President, Secretary, and a director

8  from April 1994 until February 1999.  He was also CFO from April 1994 to April 1996.

9  Francis and Thomas, along with the two other individuals, purchased AgriBioTech

10  from Fiberchem for only $425,559.  On January 5, 1996, Liviakis entered into an

11  agreement to promote AgriBioTech stock in exchange for options to purchase up to

12  1,125,000 shares of AgriBioTech stock.

13        29.    After Thomas and Francis left Fiberchem, it immediately ran into trouble,

14  announcing a loss for the six months ending March 31, 1995.  By the end of 1995,

15  Fiberchem disclosed that they suffered recurring losses that raised substantial doubt

16  about the ability to continue as a going concern.  During Fiscal 1995, Fiberchem

17  sustained a $2,829,307 loss, of which $2,137,974 was attributable to the expense of

18  providing stock to Liviakis.  Fiberchem continued to lose money for five years before

19  declaring bankruptcy in 2000.  Although Fiberchem failed, the purchase of

20  AgriBioTech was ultimately profitable for Thomas.  Thomas ultimately sold 901,707

21  shares of AgriBioTech for $5.25 per share in February of 1999, for $4,733,961.

22        30.    Less than a year after Thomas sold his shares and left AgriBioTech, it

23  declared bankruptcy.  In its S-1 forms filed with the SEC throughout the class period,

24  the Company acknowledges that AgriBioTech filed for bankruptcy and was ultimately

25  liquidated, but does not elaborate.  In reality, AgriBioTech was literally a case study in

26  pie-in-the-sky accounting, having been cited by CNBC correspondent David Faber in

27  his book *The Faber Report: CNBC's "The Brain" Tells You How Wall Street Really*

28  *Works* as a major example of over aggressive accounting of acquisitions.  During

7

Thomas and Francis' tenure, AgriBioTech was investigated by the SEC for inappropriately recording acquisitions as effective before AgriBioTech in fact had obtained control.  The SEC forced AgriBioTech to restate earnings for the quarters ending September 30th and December 31, of 1997, as well as the fiscal year ended June 30, 1997.  These restatements ultimately caused the unwinding of AgriBioTech. Thomas was replaced as CEO in February of 1999 and within a year of his replacement, AgriBioTech declared bankruptcy.

31.    Although Thomas and Francis jumped ship before AgriBioTech finally collapsed, they did not escape unscathed.  As a result of his misconduct at AgriBioTech, the bankruptcy trustee filed suit for fraud against Thomas and Francis. The suit ultimately settled.

32.    Next, Thomas and Francis started Consolidation Services, Inc.  ("CSI"), an entity formed on January 26, 2007 to engage in the acquisition of organic and natural food companies.  Thomas took on the role as Chairman, CEO, and President.  Francis acted as Vice President, Chief Financial Officer, and Director.  Despite starting life as an organic food company, CSI purchased assets in the fossil fuel field.  While CEO of CSI, Thomas claimed that CSI had $22 billion worth of coal and predicted that CSI would receive $2-4 million in revenues starting in 2009, with total royalties for the life of the project of $600 million.  Despite these claims, CSI generated no revenue in 2009. In January 2010, CSI spun off the bulk of its assets and liabilities to Colt Resources, Inc. and distributed the shares of Colt Resources to the shareholders of CSI.  Colt Resources, however, was not a publicly traded company, and investors therefore were left captive and unable to freely dispose of their shares.  In April of 2010 a controlling share of CSI was sold to outside investors, and its stock price collapsed.  Colt Resources, however, is still in operation, with Thomas remaining as President and Francis as CFO.  Defendants have failed to disclose their roles with Colt Resources in Blue Earth's SEC filings.

**B.     Thomas Takes the Helm at Blue Earth**

33.     Blue Earth was founded as "Cherry Tankers Inc." on March 30, 2007, as a footwear company.  It generated no revenues as a shoe company and on October 30, 2009 changed its name to Genesis Fluid Solutions Holdings, Inc. and at the same time merged with Genesis Fluid Solutions, LTD, a private Colorado corporation.  All pre-merger assets of the company were transferred to certain stock holders in exchange for the cancellation of their stock in the Company.  At this point, the CEO and principal owner of the Company was Michael Hodges and Liviakis Financial Communications, Inc. became the owner of 1 million shares, or 7%, of the company, pursuant to consulting agreements which required Liviakis Financial Communications to promote the Company's Stock.

34.     Less than one year later, the Company again changed its name, to Blue Earth, and re-sold Genesis Fluid Solutions, Ltd. back to Michael Hodges and other investors.   Around the same time, on September 1, 2010, the Company hired Thomas as CEO and Francis as Vice President of Corporate Development and Investor Relations.   Defendants made clear that, with Thomas and Francis on board, the Company's strategy was to make a series of acquisitions in clean tech related technologies.

**C.     Blue Earth Purchases Several Companies and Grossly Exaggerates their Value**

35.     Blue Earth's first acquisition was of Castrovella, Inc. ("Castrovella").  It paid for Castrovella with 1,011,095 shares of Blue Earth stock and $150,000 in cash. Simultaneously, Blue Earth paid 267,857 shares of Blue Earth stock to Humitech of NC, Inc., so that Castrovella could acquire the assets of Humitech.  The stock was valued at $1.90, so the total value of the acquisition was $2,580,009.  According to Blue Earth, the shareholder equity of Castrovella at the time of acquisition was $2,430,009.   However, this included a valuation of $2,458,250 for Castrovella's distributorship and customer base.  If the value of Castrovella's distributorship and

Amended Class Action Complaint for Violation of the Federal Securities Laws

customer base were excluded, Castrovella would have been worthless.

36.     In a slide presentation dated given on October 18 2011 Defendants stated that in 2012, Revenues for Castrovella were projected to be $15-20 million.  In reality, 2012 revenues were $3.4 million.

37.     On September 7, 2011, Blue Earth acquired ownership of 100% of Xnergy, Inc. ("Xnergy") and ecoLegacy, LLC ("Eco"), which was the financing vehicle for Xnergy.  Blue Earth paid 4,500,000 shares of stock worth $1.72/share for the acquisition, for a total purchase price of $7,740,000.  Blue Earth stated that Xnergy had shareholder's equity of $7,740,000. But Blue Earth valued Xnergy's customer base at $9,137,225, meaning that absent attaching an inflated value to this customer base, Xnergy was worthless.

38.     Thomas projected that Xnergy and Castrovella would together generate between $33 and $58 million in 2012.  Xnergy in fact generated $5,022,114 in revenues in 2012, which combined with Castrovella's revenues came to $8.5 million, far short of projections.

## V.     DEFENDANTS' FALSE STATEMENTS DURING THE CLASS PERIOD

### A.     Blue Earth Touts UPStealth

39.     On August 23, 2013 Blue Earth acquired Millennium Power Solutions ("MPS") for 3,694,811 shares of stock at $2.95 for a total price of $10,899,692. According to Blue Earth, MPS manufactures intelligent, digital, rechargeable battery products and backup systems with twice the energy of lead acid batteries in a smaller space.  MPS used this technology to create a battery backup system for traffic lights that is called "Ultrapower Stealth" or "UPStealth."  Blue Earth valued MPS' battery technology at $10,039,872, meaning that virtually the entire value of MPS was battery technology. The UPStealth technology was in fact the only proprietary technology owned by MPS at the time of the acquisition.  A search of the US patent database revealed one patent application, which was denied after the class period, assigned to MPS – for a "battery backup technology" that describes UPStealth. Blue Earth claims

10

1   that UPStealth is differentiated from other products in the market because it relies on a

2   nickel-zinc battery rather than a lead acid battery.

3        40.    MPS was desperate for an acquisition when it was acquired by Blue Earth.

4   CW1, who was a Junior Technician for MPS from December 2012 until April 2013,

5   revealed that without an acquisition, CW1 would have had difficulty funding growth

6   or paying employees. CW1 stated that MPS was unable to pay CW1 a salary

7   commensurate with what CW1 was worth.  CW1 stated that an audit of MPS in

8   connection with the contemplated acquisition did not go well and that as of April, when

9   CW1 departed, it appeared that the acquisition would not occur.  This is reflected by

10  the fact that Blue Earth's Letter of Agreement on January 28, 2013 was terminated on

11  March 1, 2013.  For reasons unknown to investors, Blue Earth resumed negotiations,

12  notwithstanding the problems with the audit, and ultimately closed its transaction with

13  MPS.

14       41.    On October 7, 2013, the Company filed a Form 8-K with the SEC, signed

15  by Defendant Thomas containing a slide presentation which claimed that the potential

16  size of the market for UPStealth was $3.6 billion, with 400,000 intersections at $6,000

17  per intersection, as well as a potential market of $1.2 billion from 200,000 railroad

18  crossings.  This information appeared on the following slide:

19

20

21

22

23

24

25

26

27

28

Amended Class Action Complaint for Violation of the Federal Securities Laws



## Energy Power Solutions: Markets

- Traffic intersections: 400,000, $6,000/intersection = $2.4B
- Railroad Crossings: 200,000 = $1.2 B
- Market verticals: Oxygen units, wheelchairs, etc.
- Energy efficiency: Decreases peak power useage for most BBLU customers, data rooms, medical device power supply, and many others

*Save Energy   Save Money   Save The Planet*

**Blue**Earth

42.     On June 16, 2014, the Company issued a press release announcing the commencement of the fulfillment of backlog orders for UPStealth and touting its market potential, although, strangely, providing an estimate of 313,000 intersections, less than the 400,000 stated previously.  Blue Earth stated:

> ***According to industry sources, there are an estimated 313,000 signalized traffic intersections in the US and the market potential is approximately $453 million***.

43.     On September 11, 2014, the Company filed a Form 8-K with the SEC, signed by Defendant Thomas, containing a slide presentation to be given during meetings with certain investors that same day, which included the following slides touting the market potential of UPStealth:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



# BlueEarth

## **Markets within the Traffic Sector**

▸Signalized Intersections
approximately 313,000 in US



▸Freeway Ramp Metering



▸Railroad Crossings



▸Vehicle Messaging Signs



▸School Zone Flashers



13



# UPStealth's Traffic Market Potential

### United States & Canada total potential
## $504,829,100
(does not include other potential vertical markets in Traffic)

▶US Market potential: **$453,850,000**

▶Canada Market potential:  **$50,979,100**
- Population of 35,158,300 is 35,158 signalized intersections X 25%= 8,789 intersections that need BBS x $5,800= $50,979,100

44.     These slides do not explain why Blue Earth walked back its claim that there were 400,000 intersections where they could install their technology, or its claim that the potential value of those intersections was $2.4 billion.  Nor does Blue Earth actually explain why it estimates that its US market potential is $453,829,100. However, it appears that the formula used in the slide above to calculate Canadian market potential was used to calculate American market potential – the Company assumed that 25% of signalized intersections required battery backup systems and that each system cost $5,800.  This estimate does not explain either why its estimate for the cost of a battery backup system was $200 less per system than its prior estimate, or the basis for the assumption that 25% of signalized intersections require battery backup systems.

45.     In addition, the statement that the sale price of the UPStealth battery backup system was $5,800 was false, and therefore the statement that the market

Amended Class Action Complaint for Violation of the Federal Securities Laws

potential was $504,829,100 was also materially false and misleading because Defendants had no reasonable basis for this statement.   A government contracts database maintained by the government of Utah reveals that it paid $2,225 per unit for a UPStealth inverter and $2330 for a battery on February 4, 2014, meaning that the retail price of the UPStealth system during the class period was $4,555.  Of course, Blue Earth does not receive the retail price, the distributor does.  Therefore, under a best case scenario, the wholesale price of UPStealth is around $3,000.  This means the true potential market size is little more than half of what Blue Earth claims, even assuming the stated number of signalized traffic intersections is accurate.

46.     In addition, the statement that the potential market size for UPStealth was 25% of all intersections was materially false and misleading because UPStealth knew throughout the class period that the potential market size was much lower than 25% of all traffic intersections. In reality, when government entities purchased UPStealth products, they only used them for a small fraction of their intersections.  Blue Earth's own website now reveals that in August of 2012, Washington DC purchased UPStealth systems, but only purchased 38 units, for a city of over 650,000 people.  Similarly in September of 2012, Sacramento purchased 7 systems, for a city of over 470,000.  The city of Boulder, with a population of over 100,000, only purchased ten systems when it acquired UPStealth systems in April 2013.  Given that UPStealth's existing customer base only purchased UPStealth systems for a tiny percentage of their total signalized traffic intersections, Blue Earth's claims that their potential market size was all or even one quarter of all intersections was plainly untrue and misleading. Given that Blue Earth has exaggerated both the number of potential sales and the price per unit, Blue Earth has exaggerated the dollar value of its market size by more than 100%.

**B.     Blue Earth Exaggerates Extent of CHP Projects**

47.     Blue Earth next acquired IPS Power Engineering, Inc. ("IPS") and Global Renewal Energy Group, Inc. ("GREG") on July 15, 2013 for 15,500,000 shares of stock valued at $2.84 for a total price of $44,035,500.  IPS and GREG's principal asset

1   was a construction project then in progress that Blue Earth valued at $44,029,229.

2       48.   IPS was in the business of building and managing combined heat and

3   power "CHP" alternative energy plants.  On October 7, 2013, Blue Earth filed an 8-K

4   with the SEC, signed by Thomas, that included a presentation that claimed that the

5   Blue Earth planned to construct 7 power plants by 2014, with a projected EBITDA

6   (earnings before interest, taxes, depreciation, and amortization) of $13 million, and that

7   it would cost $130 million to produce, yielding an EBITDA rate of 10%.  Of this 130

8   million, 11 million would come from equity, with the remaining 119 million – or 91.5%

9   - coming as debt.

10      49.   On September 11, 2014, Blue Earth filed an 8-K with the SEC, signed by

11   Thomas, stating that Blue Earth expects to build power plants for JBS USA Holdings,

12   Inc., a subsidiary of JBS S.A., the largest food processing company in the world.  The

13   8-K also claimed that "Blue Earth expects to turn on the first 3-4 power plants for JBS

14   in 2014 and an additional 4-10 power plants in 2015."

15      50.   This statement was false and misleading because, at the time that it was

16   made, Blue Earth only had one plant under development with JBS – in Alberta, Canada.

17   On December 3, 3014, Blue Earth stated, in a presentation hosted on the website of

18   Liviakis Financial Communications, that Blue Earth would only complete construction

19   of the building that would host the first power plant, in Alberta, Canada, in December

20   of 2014, and that this first power plant would not be operational until the fourth quarter

21   of 2015.  That presentation also reveals that only one other plant was under construction

22   by December 3, 2014, at Sumter, South Carolina.  However, according to an 8-K filed

23   by Blue Earth on December 4, 2014, and signed by Thomas, Blue Earth did not even

24   secure an agreement to build the facility in Sumter until December 1, 2014.  Given that

25   Blue Earth's own internal projections with respect to the Alberta plant involve

26   construction time over a year, it is impossible that this plant could have been

27   operational in 2014, and the claim that 3-4 power plants would be operational during

28   2014 was impossible given that only two plants even began construction by December

Amended Class Action Complaint for Violation of the Federal Securities Laws

of 2014.  In addition, it was implausible that the projects would be completed in 2014 because financing was not obtained until 2015.  Debt financing for the Sumter, South Carolina plant was not obtained until February 24, 2015, and was not obtained for the Alberta, Canada plant until March 10, 2015.

51.  Adding insult to injury, Blue Earth will be paying 12% interest for this financing.  Given that 91.5% of the project will be financed with debt, Defendants will be required to pay 10.98% of the cost of the project in interest payments.  Because the anticipated EBITDA rate is only 10%, Defendants will sustain a loss on these projects.

## VI.   THE TRUTH BEGINS TO EMERGE

52.  On October 21, 2014, the short seller "Pump Stopper" published an article (the "Pump Stopper Report") alleging that Blue Earth was nothing more than a pump and dump stock promotion.

53.  The Pump Stopper Report accused Blue Earth of misrepresenting its UPStealth business.

54.  The article notified the market, for the first time, that "the size of the market 'opportunity' BBLU presents appears misleading … and is not even close to accurate."  The article notes that BBLU quotes "different numbers in different presentations."

55.  The Pump Stopper Report notes, in reference to Blue Earth's claim on September 11, 2014, that the North America market potential for UPStealth is $504.8 million, that "the $500 million+ market potential number BBLU throws around here is without credibility and misleading as well."

56.  Pump Stopper also pointed out that Blue Earth had lied about how much it would receive for each UPStealth system it sold.

57.  The Pump Stopper report also accused Blue Earth of falsely stating it would have three to four CHP plants up and running by the end of 2014, noting "this is clearly not possible given not one of them is turned on yet."

58.  The *SeekingAlpha.com* article also revealed, among other things, the

Amended Class Action Complaint for Violation of the Federal Securities Laws

following:

> (a) Defendants Thomas and Francis previously presided over disasters at many companies, including the publicly traded AgriBioTech, which resulted in fraud allegations and bankruptcy; and

> (b) Blue Earth has hired multiple questionable stock promoters, including the infamous John Liviakis – founder and Chairman of Liviakis Financial Communications, Inc., the Californian investor relations firm for Blue Earth – who was involved in countless stock market wipeouts, including Cascade International, Airship International Ltd., and Holmes Microsystems, and recently sold his Blue Earth stock.

59. Following this negative news, the Company's stock fell $1.29 per share, or 50%, on extraordinary volume from its previous closing price to close at $1.29 per share on October 21, 2014.

## VII.   ADDITIONAL ALLEGATIONS OF SCIENTER

60. Defendant Thomas had a strong motive to commit fraud in order to facilitate the sales of Blue Earth stock by his family members, who were able to sell several million dollars worth of Blue Earth stock during the class period. On May 20, 2014, Defendant Thomas caused to be filed a registration statement that permitted certain holders of restricted Blue Earth securities to sell their shares. Members of Thomas's immediate family and trusts controlled by them held 2,047,080 shares of Blue Earth stock, or warrants to buy such stock, which became eligible for sale due to the filing of this registration statement. This includes 495,000 shares held by Manzano Limited Partnership, and 28,000 shares held by Dave Living Trust, trusts controlled by Thomas' adult son. Manzano Limited Trust distributed additional shares to Thomas' family members. These shares, on May 20, 3024, were worth $2.7 per share, for a total of $7.2 million.

61. Similarly, Defendant Francis had strong motive because, in that same registration statement, members of Francis' immediate family and trusts controlled by them held 1,905,000 shares of Blue Earth stock, or warrants to by such stock, which

18

Amended Class Action Complaint for Violation of the Federal Securities Laws

became eligible by the filing of the registration statement.  This includes 770,000 shares held by CKC, LLC and 60,000 shares held by Lady Bug Trust, controlled by Francis' wife, and 60,000 shares held by Cricket Trust, held by Francis' adult daughter.  These shares, on May 20, 2014, were worth $2.70 per share, for a total of $5.1 million.

62.    Blue Earth also engaged in a series of stock-funded acquisitions throughout the class period.  The more inflated the price of Blue Earth stock became, the easier and cheaper it was for Blue Earths to complete the acquisitions. Therefore, Defendants had an incentive to keep the price of Blue Earth Stock inflated in order to continue to fund those acquisitions.   In these acquisitions Blue Earth distributed 24,973,763 shares of stock valued at $65,089,701.25.

63.    Defendants also relied heavily on company stock to retain the services of various professionals that they employed.  On August 6, 2013, Blue Earth issued 60,000 shares of Common Stock to Jim Mao, a consultant; on August 7, 2013, Blue Earth issued 84,000 shares of Common Stock to each of Broadway Family Group LLC and Green Planet Investment Consultants LLC under consulting agreements; on September 19, 2013, Blue Earth issued 153,000 and 17,000 shares, to John Liviakis and Michael Bayes, respectively, for "investor relation services"; on February 12, 2014 the Company issued an aggregate of 50,000 shares of common stock to three consultants (National Securities Corp - 7,500 shares, David Unsworth 21,500 shares and Richard Goldstein 21,250 shares) for services rendered; on February 12, 2014 an aggregate of 1,750,000 restricted shares of common stock and options to purchase 1,500,000 shares of common stock were issued to Donald R. Kendall, Jr. in connection with his employment agreement and the purchase of Kenmont Solutions Capital GP, LLC.  An additional 25,090 shares of Common Stock were issued to Mr. Kendall on February 18, 2014, under his employment agreement in satisfaction of expenses incurred; on March 3, 2014, 35,000 shares of Common Stock were issued to Joseph Patalano for consulting; on March 14, 2014, Blue Earth issued 150,000 shares of its common stock to Lyons Capital, LLC, for consulting; on May 8, 2014, the Company

19

issued 16,014 shares of common stock to David Hutcher & Citron LLP for legal services.

64.     Defendants also compensated directors with stock.  On January 2, 2014, 100,000 shares of common stock were issued to each of Michael Allman, James Kelly and Governor Bill Richardson in connection with their election to the Company's Board of Directors.

65.     Defendants also used stock to obtain debt financing.  On September 11, 2013, the Company issued 30,396 shares of Common Stock to Caledonian Bank Limited.

66.     In the May 20 registration statement, Defendants registered for sale 2.7 million shares of stock that would be issued upon exercise of warrants that had been given as payment to various outside consultants, including the Chairman of the Board of Directors of the Company, as well as 6 million shares to "three members of management and two employees" under their "employment and consulting contracts." The registered offering also made available for sale shares of common stock underlying warrants for 57,500 shares of stock issued to placement agents in private placements, 151,931 warrants issued to placement agents in another offering, 650,000 warrants to two officers of a subsidiary in exchange for debts owed to them, 212,500 warrants to the Chairman in exchange for a loan, and 100,000 to Steven D. Lee.  Defendants also disclosed in its 10-Q dated May 16, 2014 for the quarter ending March 31, 2014 that subsequent to March 31, 2014, Blue Earth issued 16,014 shares of common stock for "legal services"  On August 11, 2014, 10,000 shares of restricted common stock were issued to Davidoff, Hutcher & Citron LLP for legal services rendered.  In short, the Company used warrants for Company stock as currency to fund their operations, and therefore a drop in their stock price would have left them unable to fund future operations.

67.     Defendants intentionally selected highly unreliable accounting firms to act as auditor.  The 2011 10-K lists Lake & Associates as auditor.  In 2013 the PCAOB

1  censured both the firm and the founder, Jay Charles Lake, revoked the registration of

2  the firm, and barred Lake from being an associated person of a registered public

3  accounting firm.

4       68.    Their next auditor, HJ associates, received deficiency reports from the

5  PCAOB in 2006 and in 2010.  The 2006 deficiency report stated that the "firm did not

6  obtain sufficient competent evidential matter to support its opinion on the issuer's

7  financial statements. Those deficiencies included-the failure to perform and document

8  sufficient procedures to test revenue." The 2010 report states a deficiency in their

9  "failure to perform sufficient audit procedures to evaluate the accounting for financial

10  instruments."

11       69.    Also indicative of scienter is the Company's decision to rely heavily on

12  Liviakis Financial Communications, Inc., as its paid stock promoter.  Liviakis is

13  notorious in the investment industry as a promoter of stocks with no inherent value.

14  The prominent investor Dan Loeb stated that he specifically targeted Liviakis's client

15  list for short targets.  Liviakis once promoted Biopulse International, Inc, whose

16  Tijuana clinic was shut down by local health authorities because the clinic's treatments

17  included inducing daily comas in patients and injecting them with their own urine.

18  Biopulse was forced by the FTC to stop advertising the efficacy of their treatments and

19  its registration was revoked by the SEC on March 10, 2006 after failing to file any

20  periodic reports after April 30, 2002.  Liviakis also promoted Cascade International.

21  The CEO of Cascade, Victor G. Incendy, was indicted for defrauding Cascade investors

22  and is to this date a fugitive wanted by the US Marshal's Service.

23       70.    Defendants have attempted to cover-up and conceal their misconduct,

24  removing from the "press releases" section of their website all press releases prior to

25  August of 2014.   This evidences their consciousness of guilt.

26       71.    Scienter can be inferred from the fact that their fraudulent conduct related

27  to "core operations."  The price of their products, their capital expenditures, and the

28  interest rates paid for debts are all core operations within the knowledge of Defendants.

72.     Scienter can also be inferred from the fact that Blue Earth has very few employees.  The parent company has six employees.  Blue Earth EPS, which handles UPStealth, has ten full time employees and three part time employees.  Blue Earth CHP has 20 full time employees and nine part time employees.  Given the small size of the parent company and the subsidiaries involved in the fraud, Defendant Thomas had the means to be in close individual contact with all employees with relevant knowledge.

73.     Scienter can also be inferred from Defendant Thomas's response to the Pump Stopper Report.  The same day that the Pump Stopper Report was issued, Defendant Thomas issued a press release that attempted to refute the report.  Notably, defendant did not deny or even address the allegation that Blue Earth exaggerated the size of its market, notwithstanding the fact that Blue Earth could have easily demonstrated the true price of UPStealth products by simply providing a purchase invoice.  Their decision to respond to the Pump Stopper Report without refuting those allegations demonstrates their knowledge that there was no response because the Pump Stopper Report was correct.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

74.     At all relevant times, the market for Blue Earth's common stock was an efficient  market for the following reasons:

(a)     Blue Earth's stock met the requirements for listing, and was listed and actively traded on the OTCQB and NASDAQ, both highly efficient and automated national market;

(b)     During the Class Period, on average, 700,000 shares of Blue Earth stock were traded on a weekly basis.  This is over 2% of the shares in Blue Earth's float and over 1% of its shares outstanding, demonstrating a very active and broad market for Blue Earth stock and permitting strong presumption of an efficient market;

22

(c)     As a regulated issuer, Blue Earth filed with the SEC periodic reports during the Class Period;

(d)     Blue Earth regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     Blue Earth was followed by securities analysts who wrote reports on Blue Earth that were publicly available and entered the public marketplace;

(f)     Numerous FINRA member firms were active market-makers in Blue Earth stock at all times during the Class Period; and

(g)     Unexpected material news about Blue Earth was rapidly reflected in and incorporated into the Company's stock price during the Class Period;

(h)     Blue Earth was eligible to file a Form S-3 during the class period, and did so.

75.     As a result of the foregoing, the market for Blue Earth's common stock promptly digested current information regarding Blue Earth from all publicly available sources and reflected such information in Blue Earth's stock price.   Under these circumstances, all purchasers of Blue Earth's common stock during the Class Period suffered similar injury through their purchase of Blue Earth's common stock at artificially inflated prices, and a presumption of reliance applies.

Amended Class Action Complaint for Violation of the Federal Securities Laws

**IX.    AFFILIATED UTE**

76.    Neither Plaintiff nor the Class need prove reliance – either individually or as a class because under the circumstances of this case, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**X.    PLAINTIFF'S CLASS ACTION ALLEGATIONS**

77.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased the common stock of Blue Earth during the Class Period and held such shares until the end of the Class Period, who were damaged thereby.  Excluded from the Class are Defendants, the current and former officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

78.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Blue Earth's common stock was actively traded on the OTCQB and NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by Blue Earth or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

79.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

80.    Plaintiff will fairly and adequately protect the interests of the members of

Amended Class Action Complaint for Violation of the Federal Securities Laws

1  the Class and has retained counsel competent and experienced in class and securities
2  litigation.

3      81.    Common questions of law and fact exist as to all members of the Class
4  and predominate over any questions solely affecting individual members of the Class.
5  Among the questions of law and fact common to the Class are:

6          (a)    whether the federal securities laws were violated by Defendants'
7              acts as alleged herein;

8          (b)    whether the misstatements and omissions alleged herein were made
9              with scienter;

10         (c)    whether statements made by the Individual Defendants to the
11             investing  public during the Class Period misrepresented and/or omitted
12             material facts about the business, prospects, and operations of Blue Earth;
13             and

14         (d)    to what extent the members of the Class have sustained damages
15             and the proper measure of damages.

16     82.    A class action is superior to all other available methods for the fair and
17  efficient adjudication of this controversy since joinder of all members is impracticable.
18  Furthermore, as the damages suffered by individual Class members may be relatively
19  small, the expense and burden of individual litigation make it impossible for members
20  of the Class to redress individually the wrongs done to them.  There will be no difficulty
21  in the management of this action as a class action.

22  **XI.    FIRST CLAIM: Violation of Section 10(b) of The Exchange Act and Rule**
23  **10b-5 Promulgated Thereunder Against Defendants Thomas and Blue Earth**

24     83.    Plaintiff repeats and reallege each and every allegation contained above
25  as if fully set forth herein.

26     84.    This First Claim is asserted against Defendants Thomas and Blue Earth
27  ("First Count Defendants").

28     85.    During the Class Period, First Count Defendants carried out a plan,

1  scheme and course of conduct which was intended to, and throughout the Class Period,

2  did: (1) deceive the investing public, including Plaintiff and other Class members, as

3  alleged herein; and (2) cause Plaintiff and other members of the Class to purchase

4  and/or sell Blue Earth common stock at artificially inflated and distorted prices.  In

5  furtherance of this unlawful scheme, plan and course of conduct, First Count

6  Defendants, individually and as a group, took the actions set forth herein.

7  86.   First Count Defendants, individually and in concert, directly and

8  indirectly, by the use, means or instrumentalities of interstate commerce and/or of the

9  mails, engaged and participated in a continuous course of conduct to conceal adverse

10  material information about the business, operations and future prospects of Blue Earth

11  as specified herein.

12  87.   First Count Defendants employed devices, schemes and artifices to

13  defraud, while in possession of material adverse non-public information and engaged

14  in acts, practices, and a course of conduct  as alleged herein in an effort to assure

15  investors of Blue Earth's value and performance and continued substantial growth,

16  which included the making of, or the participation in the making of, untrue statements

17  of material facts and omitting to state material facts necessary in order to make the

18  statements made about Blue Earth and its business operations and future prospects in

19  light of the circumstances under which they were made, not misleading, as set forth

20  more particularly herein, and engaged in transactions, practices and a course of

21  business that operated as a fraud and deceit upon the purchasers of Blue Earth's

22  common stock during the Class Period.

23  88.   Each of the Defendant Thomas's primary liability, and controlling person

24  liability, arises from the following facts: (1) Defendant Thomas was a high-level

25  executive,  director, and/or agent at the Company during the Class Period and a member

26  of the Company's management team and had control thereof; (2) Defendant Thomas,

27  by virtue of his responsibilities and activities as a senior officer and/or director of the

28  Company, was privy to and participated in the creation, development and reporting of

the Company's financial condition; (3) Defendant Thomas enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; (4) Defendant Thomas was aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading; and (5) Defendant Thomas culpably participated in the wrongful conduct alleged herein.

89.    First Count Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Blue Earth's financial condition and future business prospects from the investing public and supporting the artificially inflated or distorted price of its common stock.   As demonstrated by First Count Defendants' overstatements and misstatements of the Company's financial condition and business prospects throughout the Class Period, First Count Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

90.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for Blue Earth's common stock was artificially inflated during the Class Period.   In ignorance of the fact that market prices of Blue Earth's publicly-traded common stock were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by First Count Defendants, or upon the integrity of the market in which the Company's common stock trade, and/or on the absence of material

1   adverse information that was known to or recklessly disregarded by First Count

2   Defendants but not disclosed in public statements by First Count Defendants during

3   the Class Period, Plaintiff and the other members of the Class acquired and/or sold Blue

4   Earth common stock during the Class Period at artificially high prices and were

5   damaged thereby.

6         91.    At the time of said misrepresentations and omissions, Plaintiff and other

7   members of the Class were ignorant of their falsity, and believed them to be true.  Had

8   Plaintiff and the other members of the Class and the marketplace known the truth

9   regarding Blue Earth's financial results, which were not disclosed by First Count

10   Defendants, Plaintiff and other members of the Class would not have purchased or

11   otherwise acquired Blue Earth common stock, or, if they had acquired such common

12   stock during the Class Period, they would not have done so at the artificially inflated

13   prices or distorted prices at which they did.

14         92.    By virtue of the foregoing, First Count Defendants have violated Section

15   10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

16         93.    As a direct and proximate result of First Count Defendants wrongful

17   conduct, Plaintiff and the other members of the Class suffered damages in connection

18   with their respective purchases and sales of the Company's common stock during the

19   Class Period.

20         94.    This action was filed within two years of discovery of the fraud and within

21   five years of Plaintiff's purchases of securities giving rise to the cause of action.

22   **XII.   SECOND CLAIM: Violation Of Section 20(a) of The Exchange Act Against**

23   **the Individual Defendants**

24         95.    Plaintiff repeats and realleges each and every allegation contained above

25   as if fully set forth herein.

26         96.    This Second Claim is asserted against each of the Individual Defendants.

27         97.    The Individual Defendants acted as controlling persons of Blue Earth

28   within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue

of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's revenues and earnings and dissemination of information to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

98.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

99.    As set forth above, Blue Earth violated Section 10(b) and Rule 10b-5.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein.   As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

100.    This action was filed within two years of discovery of the fraud and within five years of Plaintiff purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating Plaintiff's class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XIII.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 13, 2015                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Lead Counsel for Plaintiffs

Amended Class Action Complaint for Violation of the Federal Securities Laws